UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Bruce W. Luther,

                        Plaintiff,

        vs.

Scott T. Johnston, Peter Irvine,
Rhonda Russell, Scott Allen, Vice
President, Thomas Johnson,
President, Director, Robert Allen,
Director, Arden Anderson, Director,
Lloyd Arbart, Director, Thomas
Kotula, Director, Marvin Shipman,
Director, Patrick Smith, Director,
American National Bank of Minnesota,
a Minnesota corporation, Georgia
Nelson, Tri County Process Service,
1-99 Unnamed John Does,

                        Defendants.        Civ. No. 04-3053 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a special assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(A) and (B), upon the Motion of the Plaintiff to Stay State Court

proceedings; the  Motion of the Defendant Scott T. Johnston ("Johnston") to Dismiss;

the Motion of the Defendants Robert Allen, Scott Allen, American National Bank of

Minnesota, Arden Anderson, Lloyd Arbart, Thomas Johnson, Thomas Kotula, Marvin

Shipman, and Patrick Smith  (hereinafter "Bank Defendants"), to Dismiss; the Motion

of the Defendants Peter Irvine ("Irvine"), and Rhonda Russell ("Russell"), to Dismiss;

Johnston's Motion for Sanctions; the Bank Defendants' Motion for Sanctions; and

certain of the parties' other Motions.

A Hearing on the Motions was conducted on September 17, 2004, at which

time, the Plaintiff appeared on his own behalf; Johnston appeared by Richard L.

Pemberton and Kristi A. Hastings, Esqs.; the Bank Defendants appeared by Joel M.

Fremstad, Esq.; and Irvine and Russell appeared by Paul K. Kohnstamm, Assistant

Minnesota Attorney General. [1]

---

[1]At the time of the Hearing, the Plaintiff attended only so long as to advise that he
had filed a voluntary dismissal which, in his mind, meant that the case was at a
conclusion.  In addition, the Plaintiff proffered copies of two Treaties which, he felt,
impacted upon the jurisdiction of a purported Tribal Court to assume responsibility
for this case.  By our earlier Report and Recommendation of October 26, 2004
[Docket No. 133], we rejected both arguments as unsound.  Our Report and
Recommendation was adopted by the District Court, the Honorable Richard H. Kyle
(continued...)

For reasons which follow, we recommend that the Defendants' Motions to Dismiss be granted, except as to Johnston, and the Defendants Robert Allen, and Arden Anderson; that the Motions for Sanctions, by Johnston, and by the Bank Defendants, be granted; and that the remaining Motions be denied as moot.

## II.  Factual and Procedural Background

In what we have previously described as "a muddled, and rambling, agglomeration of conclusory accusation, cryptic quotation, and rank surmise," see Report and Recommendation [Docket No. 133], at p. 4, the Plaintiff's fifty (50) page Complaint alleges, against one or more of the Defendants, causes of action for: a violation of certain Regulations that are said to govern Insured Deposit Institutions; a violation of the Consumer Credit Protection Act, Title 15 U.S.C. §1601, et seq.; a violation of the Fair Debt Collection Practices Act, Title 15 U.S.C. §1692e; a violation of the Fair Credit Reporting Act, Title 15 U.S.C. §45(a); a breach of a written contract; an avoidance of a contract for want of consideration; fraud in the inducement; promissory estoppel; breach of a covenant of good faith and fair dealing; breach of fiduciary duty; avoidance of contract for want of contracting authority;

---

[1](...continued)
presiding, by Order dated January 11, 2005.  See, Docket No. 141.

deceptive trade practices; negligent misrepresentation; assumpsit for money had and received; tort-conversion; usury; recission; unjust enrichment; civil conspiracy; a civil RICO [Racketeer Influenced and Corrupt Organizations Act, Title 18 U.S.C. §1962 et seq.] violation; and a violation of Title 42 U.S.C. §§1983 and 1985(3).   See, Report and Recommendation of October 26, 2004 [Docket No. 133], at p. 4.

Charitably construed, the Plaintiff's Complaint alleges that the Bank Defendants were without authority to loan him money for the purchase of a residence, and that their efforts, including those of their attorney -- Johnston -- who the Bank Defendants retained to represent them in State Court foreclosure proceedings which followed the Plaintiff's failure to pay his credit obligations, and a State Court Judge -- Irvine -- and Court Administrator -- Russell -- who participated, for a short time, in those proceedings, are guilty of some illusory, and ill-defined non-, mis-, or malfeasance. We understand that the State Court foreclosure proceeding is at a close, and that a further State Court proceeding, in the nature of a wrongful detainer action, so as to evict the Plaintiff from his foreclosed residential premises, is either in progress, or has been concluded.

The Motion to Dismiss, by Irvine and Russell, is predicated upon the judicial immunity doctrine, which surrounds their actions, respectively, as a State Court Judge,

or as a Court Administrator, while the Motions to Dismiss of the Bank Defendants are premised on asserted insufficiencies in the service of process upon each of them, and the resultant absence of personal jurisdiction.   As for Johnston, at the time of the Hearing, he waived his insufficiency of service defense, and acceded to the personal jurisdiction of this Court.   Transcript of Hearing of September 17, 2004 ("Tr.")[Docket No. 146], at pp. 13-14.   As a consequence, we recommend that Johnston's Motion to Dismiss be denied as moot, but we proceed, in due course, to consider his Motion to sanction the Plaintiff, inclusive of a dismissal of his Complaint, under either Rule 11, Federal Rules of Civil Procedure, or under the Court's inherent powers.

### III.  Discussion

A.   The Motion of the Defendants Irving and Russell to Dismiss.

In his Complaint, the Plaintiff has sued both Irvine, and Russell, as individuals, and in their official capacities as a State Court Judge, and as a State Court Administrator, respectively.   See, Complaint [Docket No. 1], at p. 4, ¶¶ 11 and 12. As alleged in the Complaint, the Plaintiff, and his wife, commenced an action in the State District Court for the Seventh Judicial District, contesting certain foreclosure proceedings that the Bank Defendants had instituted.   See id. at pp. 35-36, ¶¶139 and

141.[2]  While the Complaint, in purely conclusory language, intimates that Irvine, and

Russell, were acting in concert with other Defendants, the only particularization that

the Plaintiff offers is an allegation that Irvine, and Russell, engaged in delays in the

scheduling of a Court Hearing, as follows:

> The Seventh Judicial District Court did delay this plaintiff
> by way of scheduling motions to strike and injunction, said
> rescheduling began with the scheduled hearing of March 3,
> 2004 to April 5, 2004, JOHNSTON motion to continue
> from April 5, 2004 court delay from May 24, 2004 to June
> 7, 2004 and by way of the assigned judge recusal on June
> 4th 2004, permanent delay.  It is this plaintiff's belief that
> defendants, JOHNSTON, ALLEN, ALLEN, ANDERSON,
> ARBART, KOTULA, SHIPMAN, JOHNSON, SMITH,
> conspiring together with the court orchestrated said delays
> to threaten and intimidate this plaintiff, in furtherance of the
> ongoing racketeering enterprise to unjustly enrich the
> defendants to delay said hearings beyond an unlawful

---

[2]In Paragraph 141 of his Complaint, the Plaintiff identifies the State Court case by its file number -- CX-30-1579 -- which materials submitted by Irvine, and Russell, disclose as being captioned "Bruce W. Luther and Lynette C. Luther vs. American National Bank of Minnesota."  See, Exhibits C and D to the Affidavit of P. Kenneth Kohnstamm.  Our reference to these public documents does not have the effect of transforming the Motion to Dismiss of Irvine, and Russell, to one for Summary Judgment.  See, Stahl v. United States Dep't of Agriculture, 327 F.3d 697, 700 (8th Cir. 2003)("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss."), citing Faibisch v. Univ. of Minn., 304 F.3d 797, 802-03 (8th Cir. 2002); see also, Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999), citing in turn, Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999).

redemption period.  Furthermore Assigned Judge to CX-30-1579 on June 4th 2004, in said district recused himself pursuant to Minnesota Code of Judicial Conduct Section 3 D(1)(a) further evidencing stated RICO violations paragraphs 118-127.[3]

\*   \*   \*

The aforementioned civil case was filed on December 23, 2004.  No action has been taken by said court to allow plaintiffs [sic] right to due process.  The "use" of silence by the court, repeated delay and granting unlawful motions to defendants has damaged this plaintiff in excess of $75,000.

Id. at pp. 35-36, ¶141.

Insofar as we can discern, no other specific acts have been alleged against Irvine, and

Russell, and the Plaintiff only seeks money damages for his relief.

_____

[3]As the Plaintiff's Complaint recites, Canon 3(D)(1)(a), Minnesota Code of Judicial Conduct, provides as follows:

(1)   A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a)   the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding; \* \* \*.

- 7 -

Where, as here, a Judicial Officer acts within his jurisdiction to perform a judicial function, the Judicial Officer is absolutely immune from suit.  See, Mireles v. Waco, 502 U.S. 9, 11 (1991)("[L]ike other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages."), citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  "Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial."  Id. (quoting Pierson v. Ray, 386 U.S. 547, 554 (1967) for the proposition that "immunity applies even when the judge is accused of acting maliciously and corruptly.").  While the Plaintiff suggests that Irvine recused himself from the Plaintiff's State Court case on the basis of bias and prejudice, even if we were to accept that suggestion, it would not overcome Irvine's immunity from suit.[4]

---

[4]As the Supreme Court explained, in Mireles v. Waco, 502 U.S. 9, 12-13 (1991), where the litigant sued a judge, alleging that the Judge had directed police officers to bring the litigant before the Judge, and to do so by using excessive force:

> Of course, a judge's direction to police officers to carry out a judicial order with excessive force is not a "function normally performed by a judge."  Stump v. Sparkman, 435 U.S. [349], 362, 98 S.Ct. [1099], 1108 [1978].  But if only the particular act in question were to be scrutinized, then
>
> (continued...)

Nor can it seriously be denied that the scheduling, and continuance of Hearings, are judicial acts. "[T]he factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Edlund v. Montgomery, 355 F. Supp.2d 987, 990 (D. Minn. 2005), quoting Stump v. Sparkman, 435 U.S. 349, 362 (1978). Not every litigant can have his Hearings conducted on the precise date the litigant desires, and continuances of Hearings, because of the unavailability of a party, an attorney, a witness, or the Trial Judge, is a routine occurrence in both State and Federal Courts. Given that the Plaintiff complains that his Hearing for injunctive relief was continued on several

---

[4](...continued)
> any mistake of a judge in excess of his authority would become a "nonjudicial" act, because an improper or erroneous act cannot be said to be normally performed by a judge. If judicial immunity means anything, it means that a judge "will not be deprived of immunity because the action he took was in error or was in excess of his authority." Id., at 356, 98 S.Ct., at 1105.

Accordingly, even if Irvine continued the Hearings for improper reasons, the Plaintiff would not be entitled to pierce Irvine's judicial immunity.

occasions -- assertedly denying him immediate relief -- his grievance plainly relates to acts in Irvine's judicial capacity.

While we understand the Plaintiff to broadly allege that Irvine, and Russell, somehow conspired with the other Defendants, such broad and nonspecific assertions of collusion fail as a matter of law. See, Johnson v. Esry, 210 F.3d 379, 2000 WL 375269 at *1 (8th Cir., April 13, 2000)[Table disposition], citing Manis v. Sterling, 862 F.2d 679, 681 (8th Cir. 1988)("Allegations of conspiracy, however, must be pled with sufficient specificity and factual support to suggest a 'meeting of the minds.'"), quoting Smith v. Bacon, 699 F.2d 434, 436 (8th Cir. 1983). Here, the Plaintiff's conspiracy allegations fail to meet that test, as they are entirely devoid of specificity or factual support.

"Judicial immunity discourages inappropriate collateral attacks and 'protect[s] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants.'" Edlund v. Montgomery, supra at 990, quoting Forrester v. White 484 U.S. 219, 225 (1988). The circumstances, here, underscore the need for judicial immunity. We may take judicial notice of the fact that, when the Plaintiff's Motion for injunctive relief was heard before Irvine's successor, the requested relief was denied on substantive grounds -- namely, injunctive relief was not warranted.

Nonetheless, Irvine has been sued, after he recused himself, for not reaching an issue that was decided, ultimately, against the Plaintiff's interest.   Moreover, the Plaintiff sought a Writ of Mandamus, from the Minnesota Court of Appeals, to cure what he saw as Irvine's errors, only to have the application denied, again on substantive grounds.   As the history of this litigation makes plain, the Plaintiff employs litigation as a vexatious sword, and his action against Irvine is further evidence of that simple fact.   Indeed, the Plaintiff has not opposed the Motion of Irvine, and Russell, either in any written or oral submission to the Court.

Irvine is entitled to judicial immunity from the Plaintiff's suit, as the Plaintiff simply challenges the correctness of Irvine's judicial acts.   Similarly, Russell is entitled to absolute quasi-judicial immunity.   As our Court of Appeals explained, in Martin v. Hendren, 127 F.3d 720, 721 (8th Cir. 1997):

> "Absolute quasi-judicial immunity derives from absolute judicial immunity."   Roland v. Phillips, 19 F.3d 552, 555 (11th Cir. 1994).   Judges are absolutely immune from suit for money damages when they act in their judicial capacity, unless their actions are "taken in the complete absence of all jurisdiction."   Duty [v. City of Springdale, Ark.], 42 F.3d [460], 462 [(8th Cir. 1994)].   A judge's absolute immunity extends to public officials for "'acts they are specifically required to do under court order or at a judge's direction.'"   Robinson v. Freeze, 15 F.3d 107, 109 (8th Cir.

1994)(quoting Rogers v. Bruntrager, 841 F.2d 853, 856 (8th Cir. 1988)).

Since the Plaintiff does not allege any specific misdeeds by Russell, apart from the continuances granted by Irvine, she is entitled to quasi-judicial immunity. See, <u>Geitz v. Overall</u>, 62 Fed.Appx. 744, 746 (8th Cir. 2003)("Clerks are absolutely immune only for acts that may be seen as discretionary, or for acts taken at the direction of a judge or according to court rule.")(citing <u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. 429, 436 (1993), for the proposition that, "when judicial immunity is extended to officials other than judges, it is because they also exercise discretionary judgment as part of their function."); see also, <u>Penn v. United States</u>, 335 F.3d 786, 789 (8th Cir. 2003) ("Although we start with the presumption that qualified immunity is sufficient to protect governmental officials other than judges, Robinson v. Freeze, 15 F.3d 107, 108 (8th Cir. 1994), we have not hesitated to extend absolute judicial immunity to other officials for acts taken pursuant to a facially valid court order."), citing <u>Martin v. Hendren</u>, supra at 721; <u>Robinson v. Freeze</u>, 15 F.3d 107, 108-09 (8th Cir. 1994). Here, the Plaintiff alleges that Irvine granted the continuances, and the most that could be attributable to Russell was in selecting dates that were then amenable to the Court's Calendar, a purely discretionary function.

- 12 -

Therefore, we recommend that the Plaintiff's causes of action against Irvine, and Russell, should be dismissed, with prejudice, on the basis of absolute judicial, or quasi-judicial immunity.

B.    The Motion of the Bank Defendants to Dismiss for Lack of
      Personal Jurisdiction.

The Bank Defendants -- namely, the Defendants Robert Allen, Scott Allen, American National Bank of Minnesota, Arden Anderson, Lloyd Arbart, Thomas Johnson, Thomas Kotula, Marvin Shipman, and Patrick Smith -- seek a dismissal of the Plaintiff's Complaint because of the insufficiency of service of process upon them, such that, they contend, the Court does not have jurisdiction over them.  In support of the Motion, these Defendants have submitted the Affidavit of Robert J. Sefkow ("Sefkow"), who is the Chief Operating Officer, and general legal counsel, of the Defendant American National Bank of Minnesota ("American National").

In his Affidavit, Sefkow avers that, when he learned that packets, which contained the Summons and Complaints in this matter, were received from Spee Dee ("Spee Dee") delivery service, he made inquiry to determine if service of process had been accomplished.  Sefkow attests that, as to American National, the package containing the Summons and Complaint was delivered by Spee Dee to the Bank's

main office in Baxter, Minnesota, where the package was signed for by Nancy Crimmins ("Crimmins"), who is a customer service representative, and not an officer of the Bank.  According to Sefkow, none of the Bank's Directors has authorized an agent to accept service of process on a Director's behalf, and Crimmins "had no authorization to accept service of legal process or do anything more than accept a routine delivery of materials brought by Spee Dee for use in the regular course of business of the Bank."  Affidavit of Sefkow, at p. 3.  "No copy of the Summons and Complaint against the corporate entity which is the American National Bank of Minnesota was delivered to any officer, managing agent or general agent or to any other agent authorized by appointment or by law to receive process on behalf of the Bank."  Id.

Sefkow also avers that the package containing the Summons and Complaint for the Defendants Thomas Johnson, Lloyd Arhart, Patrick Smith and Marvin Shipman, was delivered by Spee Dee to the Baxter Bank office, and was also signed for by Crimmins.  Sefkow swears that "[n]o service was made on any of them since they were not personally served and there was no usual place of abode service at their residences."  Id. at 2.

- 14 -

As for the package containing the Summons and Complaint intended for the Defendant Scott Allen, Sefkow attests that Spee Dee delivered the package to the Alexandria Branch of American National, and that "Scott Allen was not personally served, nor was substituted service made at his residence." <u>Id.</u>   The package containing the Summons and Complaint for the Defendant Thomas Kotula was left, by Spee Dee, with a neighbor, as the Kotulas were not at home, and no personal service was made of Thomas Kotula, and no substituted service was made at his residence.   Lastly, the package containing the Summons and Complaint for the Defendants Robert Allen, and Arden Anderson, were delivered by Spee Dee to their respective residences.

Notably, the Plaintiff does not competently controvert any of Sefkow's averments, and therefore, we are not presented with any genuine issues of material fact, under the analytical regimen of Rule 56, Federal Rules of Civil Procedure.[5]

---

[5]We are mindful that the Plaintiff filed an "Affidavit of Mailing" on July 19, 2004, see <u>Docket No. 38</u>, but that Affidavit is plainly incompetent.  First, one cannot tell who the Affiant is by way of employment, and the most that is discernable from the Affidavit is that the Affiant mailed the Summons and Complaint either to the addressees noted, or to "Speedee Delivery Service."  If we presume, for the sake of argument, that page 5 of 6 of the Affidavit reflected deliveries that "Speedee Delivery Service" made, it is plain that the deliveries, as disclosed in the Affidavit, did not

(continued...)

Accordingly, we proceed to an analysis of whether service of process was effected on any of the Bank Defendants, by the mode of delivery chosen by the Plaintiff.  With the exception of the Defendants Robert Allen, and Arden Anderson, we find that service of process was not effected on any of the other Bank Defendants.

As would seem self-evident, proper service is necessary because, "[i]f a defendant is improperly served, a federal court lacks jurisdiction over the defendant."

---

[5](...continued)
substantially comply with the strictures of Rule 4.03(a), as constituting a substituted service of process.

Five (5) of the deliveries were to "N. Crimmins," who we know to be a customer service representative at American National's Branch in Baxter; and two deliveries were made to "M. Sether," whose address is not given but, quite logically, the recipient could not have been in two different "usual abodes" of the Defendants at the same time of day, on the same date, as is reflected in the Affidavit.  In addition, one delivery was made to "A. Bosele," and the other to "K. Morrow," but the deliveries were two (2) minutes apart, which again defies any reasonable inference that the deliveries were made at separate addresses.  Lastly, five (5) of the deliveries were made to "in door," rather than to a human recipient.  Plainly, to deliver a package to a door -- even if presumed to be at the residence of a Defendant -- does not substantially comply with the service requirements of Rule 4.03(a).  See, e.g., Lundgren v. Green, 592 N.W.2d 888 (Minn.App. 1999). Since no addresses were disclosed for each of the specific deliveries, let alone any disclosure of the name of a Defendant associated with that delivery, the "Affidavit of Mailing" is incompetent and insufficient proof of service of process upon any Defendant.  The Plaintiff had substantial time to cure the deficiencies of the "Affidavit of Mailing," once he was on notice as to the Defendants' challenge to the sufficiency of service, and he failed to counter Sefkow's Affidavit.

Printed Media Services, Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir. 1993),

citing Dodco, Inc. v. American Bonding Co., 7 F.3d 1387, 1388 (8th Cir. 1993); see

also, Sieg v. Karnes, 693 F.2d 803, 807 (8th Cir. 1982).   Service of process can be

effected, under the Federal Rules, "pursuant to the law of the State in which the district

court is held for the service of summons or other like process upon such defendant

in an action brought in the courts of general jurisdiction of that State."   Rule 4(e)(1),

Federal Rules of Civil Procedure.   Under Minnesota law, a "plaintiff may effectively

serve a summons and complaint by two methods:   personally under Minn.R.Civ.P.

4.03 or acknowledgment by mail under Minn.R.Civ.P. 4.05."   Turek v. ASP of

Moorhead, Inc., 618 N.W.2d 609, 611 (Minn.App. 2000), rev. denied (Minn., January

26, 2001).   Here, there is no contention that the Plaintiff employed "acknowledgment

by mail," in attempting to serve the Bank Defendants with process.

In pertinent part, Rule 4.03, Minnesota Rules of Civil Procedure, provides for

personal service upon an individual as follows:

> Service of summons within the state shall be as follows:
>
> (a)   Upon an Individual.  Upon an individual by delivering
> a copy to the individual personally or by leaving a copy at
> the individual's usual place of abode with some person of
> suitable age and discretion then residing therein.

> If the individual has, pursuant to statute, consented to any
> other method of service or appointed an agent to receive
> service of summons, or if a statute designates a state official
> to receive service of summons, service may be made in the
> manner provided by such statute.

Here, Sefkow avers, without contradiction, that none of the Bank Defendants has

authorized an agent to accept service of process on that Defendant's behalf.

Moreover, given Sefkow's uncontroverted testimony, none of the Bank Defendants

were personally served with a Summons and Complaint. We do note, however, that

Sefkow attests that packages, which contained the Summons and Complaint, were

delivered to the respective residences of the Defendants Robert Allen, and Arden

Anderson. While we cannot say, on this Record, that the deliveries were left at the

"usual place of abode" of either Defendant, or that the packages were delivered, there,

"with some person of suitable age and discretion then residing therein" -- as Sefkow's

Affidavit does not address such matters -- we are confident that, if such deficiencies

were present, Sefkow would have addressed them in his Affidavit, given his legal

training, and his management positions with the Bank. If, ultimately, there prove to be

deficiencies in such services of process, Defendants Robert Allen, and Arden

Anderson, will not be precluded from subsequently presenting them, but we are

obligated to rule on the Record now presented. Accordingly, we recommend that the

Bank Defendants' Motions to Dismiss be granted, on insufficiency of process grounds, except as to the Defendants Robert Allen, and Arden Anderson.[6]

With respect to American National, Rule 4.03(c), Minnesota Rules of Civil Procedure, provides, in pertinent part, as follows:

> Upon a domestic or foreign corporation, by delivering a copy to an officer or managing agent, or to any other agent authorized expressly or impliedly or designated by statute to receive service of summons, and if the agent is one authorized or designated under statute to receive service any statutory provision for the manner of such service shall be complied with. * * *

---

[6]We note, as we have elsewhere, that the fact that Robert Allen, and Arden Anderson, had actual notice may weigh in favor of the effectiveness of service at their respective residences. See, United States v. House, 100 F. Supp.2d 967, 976 n. 4 (D. Minn. 2000). For example, in Larson v. Hendrickson, 394 N.W.2d 524, 526 (Minn.App. 1986), service was made on a tenant in the defendant's house, while the defendant was out of state, and the issue was whether the house was the defendant's "usual place of abode." In that context, the defendant's actual notice of the suit contributed to the Court's finding that service was effective under Rule 4.03. Larson v. Hendrickson, supra. "This 'actual notice' exception has been recognized only in cases involving substitute service at a defendant's residence." United States v. House, supra at 976 n. 4, citing Minnesota Mining & Manufacturing Co. v. Kirkevold, 87 F.R.D. 317 (D. Minn. 1980). As we subsequently detail, in the text of this Opinion, "Rule 4 is otherwise taken literally, and cannot be satisfied by service on defendant's place of work or business." Id. On this Record, however, we are unable to determine whether the Plaintiff substantially complied with Rule 4.03(a), which is a precondition to the application of the "actual notice" exception, and we need not reach that issue, as neither Defendant has raised it here . Id.

Here, Sefkow attests, without contrary evidence from the Plaintiff, that Crimmins was not provided authorization to accept service of process on behalf of American National, and she served the Bank as a customer service representative.  Under Minnesota law, "[i]n order to limit service to persons who can reasonably be expected to apprise the corporation of service, there must be actual authority to accept service of process on behalf of the corporation at the time of service, regardless of any authority in existence before service was attempted."  Tullis v. Federated Mutual Ins. Co., 570 N.W.2d 309, 312 (Minn. 1997).  Simply put, the Plaintiff offers no showing to counter Sefkow's sworn statement that Crimmins was not actually authorized to accept service of process.

Of course, Rule 4.03(c) also allows service on "any other agent * * * authorized impliedly."  As the Minnesota Supreme Court has explained:

> Implied authority is actual authority, circumstantially proved, and is to be construed under common law principles of agency. [Derrick v. Drolson Co., 244 Minn. 144,] 152, 69 N.W.2d [124,] 130 [(Minn. 1955)].  Thus, implied authority includes only such powers directly connected with and essential to carrying out the duties expressly delegated to the agent.  Id. at 152-53, 69 N.W.2d at 130.  It is crucial to distinguish actual authority from apparent authority.  Apparent or ostensible authority is not actual authority; rather it is authority which the principal holds the agent out as possessing or knowingly permits the

- 20 -

agent to assume.  Actual authority is what is required under
Rule 4.03(c).  Id. at 153, 69 N.W.2d at 130.
<u>Tullis v. Federated Mutual Ins. Co.</u>, supra at 313.

The Plaintiff offers no direct or circumstantial evidence that tends to prove that

American National, as principal, granted implied authority to Crimmins to accept

service of process on its behalf.

Indeed, the Minnesota Supreme Court has held that, even where the process is

received by a person who represents to the process server, that she was the executive

director of the defendant, it is insufficient to establish implied authority, as intended

by Rule 4.03(c).  <u>Id.</u> at 313; see also, <u>Winkel v. Eden Rehabilitation Treatment Facility</u>,

433 N.W.2d 135, 139 (Minn.App. 1998)("An employee's willingness to accept service

of process is clearly insufficient to establish that she is an agent with implied authority

to receive service on behalf of a corporation.").   As the Court explained, "[a]ll

authority must be traced to the principal's dealings with the agent; it cannot be inferred

from the agent's dealings with third parties." <u>Id.</u>, citing <u>Winkel v. Eden Rehabilitation</u>

<u>Treatment Facility</u>, supra at 139.   The Plaintiff offers no such evidence here.

Moreover, the fact that the Bank Defendants had actual notice of the law suit against

them, does not free the Plaintiff from adhering to the strict requirements of Rule

4.03(c).  See, <u>Thiele v. Stich</u>, 425 N.W.2d 580, 584 (Minn. 1988)(applying strictures

of Rule 4.03(c) unyieldingly even though, in legal malpractice action, defendant had

actual notice of lawsuit by virtue of delivery of the Summons and Complaint to the

receptionist in his law firm).  Therefore, finding no genuine issue of material fact as to

the insufficiency of service of process upon American National, we recommend that

the Bank Defendants' Motion to Dismiss, with the exception of those of the

Defendants Robert Allen, and Arden Anderson, be granted, and the Complaint against

them be dismissed without prejudice.  See, <u>Sasser v. Republic Mortgage Investors</u>,

269 N.W.2d 758, 762 (Minn. 1978)("A dismissal for lack of personal jurisdiction is

not an adjudication on the merits."), quoting 1 Hedland & Adamson, <u>Minnesota</u>

<u>Practice, Civil Rules Ann.</u>, p.442.

   C.   <u>The Motions of Johnston, and the Bank Defendants, for</u>
        <u>Sanctions Pursuant to Rule 11, Federal Rules of Civil</u>
        <u>Procedure, and the Inherent Authority of the Court</u>.

      "Absent personal service of process, or waiver of service by the

defendant, a court ordinarily may not exercise jurisdiction over a defendant."  <u>Nieszner</u>

<u>v. St. Paul School Dist. No. 625</u>, 643 N.W.2d 645, 548 (Minn.App. 2002), citing

<u>Murphy Bros. v. Michetti Pipe Stringing, Inc.</u>, 526 U.S. 344, 350 (1999).  As we have

previously noted, at the time of the Hearing on September 17, 2004, Johnston's

counsel expressly waived any objection to the Court's jurisdiction over his person.

- 22 -

However, together with the Bank Defendants, Johnston seeks sanctions, under Rule 11, related to what they regard as the Plaintiff's abuse of the judicial processes to their prejudice. Alternatively, they ask the Court to exercise its inherent powers to assure that the Plaintiff's abusive conduct does not continue, and his past conduct does not go unpunished. See, Defendant Johnston's Memorandum [Docket No. 96], at p. 4 ("The court is not bound only by Rule 11 in deciding whether sanctions are appropriate," as "[t]he Court has inherent authority, not modified by Rule 11, to impose sanctions "for conduct which abuses the judicial process."), citing Baycol Products Litigation, 2004 WL 1052968 at *7 (D. Minn., April 12, 2004), quoting Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991).

In view of the Plaintiff's seemingly relentless abuse of the judicial process, and particularly his purposeful attack on the integrity of this Court, we conclude that sanctions under the Court's inherent authority is most appropriate to punish him for his acts, as well as to deter others who would follow suit. See, Chrysler Corp. v. Carey, 186 F.3d 1016, 1022 (8th Cir. 1999)("Sanctions are 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but [also] to deter those who might be tempted to such conduct in the absence of such a deterrent.'"), quoting National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639,

643 (1976).  In doing so, we accept that the existence of such inherent power is to allow the Courts to "manage their own affairs so as to achieve orderly and expeditious disposition of cases."  Chambers v. NASCO, Inc., supra at 43.  "Over the years, the Supreme Court has found inherent power to include the ability to dismiss actions, assess attorneys' fees, and to impose monetary and other sanctions appropriate 'for conduct which abuses the judicial process.'"  Harlan v. Lewis, 982 F.2d 1255, 1259 (8th Cir. 1993), citing Chambers v. NASCO, Inc., supra at 44.  "The Eighth Circuit has held that there is not a bad faith requirement that extends to every disciplinary action the court makes, such as monetary sanctions."  VanDanacker v. Main Motor Sales Co., 109 F. Supp.2d 1045, 1055 (D. Minn. 2000), citing Harlan v. Lewis, supra at 1260.  "However, '[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion.'"  Id., quoting Chambers v. NASCO, Inc., supra at 44.

We are obligated to apply the sanction of dismissal more cautiously for, "'[i]n our system of justice the opportunity to be heard is a litigant's most precious right and should be sparingly denied.'"  Chrysler Corp. v. Carey, supra at 1020, quoting Edgar v. Slaughter, 548 F.2d 770, 773 (8th Cir. 1977).  As our Court of Appeals has assured, however, "if dismissal 'lies within the spectrum of appropriate sanctions, we will not substitute our own judgment for that of the district court even though we may have

- 24 -

chosen a different sanction had we been standing in the shoes of the trial court.'"
Martin v. Daimler Chrysler Corp., 251 F.3d 691, 694 (8th Cir. 2001), quoting Chrysler
Corp. v. Carey, supra at 1020.  Moreover, "[t]he district court is not constrained to
impose the least onerous sanction available, but may exercise its discretion to choose
the most appropriate sanction under the circumstances."  Chrysler Corp. v. Carey,
supra at 1022.

Here, we find the evidence both clear and convincing that misconduct occurred
at the hands of the Plaintiff, and that a lesser sanction than dismissal would not
sufficiently punish and deter the abusive conduct while allowing a full and fair trial on
the merits.  See, Martin v. Daimler Chrysler Corp., supra at 694-95, citing Shepard v.
American Broadcasting Cos., 62 F.3d 1469, 1480 (D.C. Cir. 1995); see also, Thoms
v. McDonald's Corp., 2003 WL 22901686 at *1 (D. Minn., November 26, 2003); Hill
v. West Publishing Co., 1998 WL 1069117 (D. Minn., September 24, 1998).  The
Record reflects that, after the Defendants moved for a dismissal of the Plaintiff's
claims, the Plaintiff purported to remove this action to the "PEMBINA NATION Little
Shell Band, Federal Tribal Circuit Court."  See, Docket No. 58-2, pp. 9-10 of 16.  No
lawful basis for doing so has ever been referenced by the Plaintiff, let alone
established.  In claiming to have removed the case, the Plaintiff purported to have

- 25 -

amended his Complaint, apparently by fiat, so as to name defense counsel, in this Federal action, as newly joined Defendants in the "Tribal Court" proceedings.  See, Docket No. 58-2, p. 2 of 16.  To compound the absurdity of these acts, each purported pleading, in the removal and amendment process, bears the legend of this Court, and is verified by the Plaintiff by notarized signature.

Not content with the baseless "removal" of this Federal action to a "Tribal Court," the Plaintiff obtained, ex parte, an Order of Temporary Injunction and Temporary Restraining Order which, by our reading, would prohibit the Defendants in this proceeding, and their legal counsel, from further participation in this action, as the Plaintiff's claims, here, relate to the Plaintiff, and arise out of the "defendant's [sic] unlawful actions relating to foreclosure, sheriff's sale and redemption period" -- acts which were ostensibly enjoined.  Docket No. 58-2, p. 6 of 16.  Yet still not content, the Plaintiff then served a Motion for Contempt of Court, which bore the legend of this Court, but which was returnable to the "Tribal Court," and which requested sanctions against Johnston "in the amount that [the "Tribal Court"] deems appropriate and the Incarceration of Defendant Johnston until the contempt has been purged."  Docket No. 58-4, at p. 3 or 8.

In order to preserve the status quo, on August 2, 2004, we issued an Order, see Docket No. 57, which directed the Clerk of Court to take no action on the Plaintiff's purported Notice of Removal, and we also issued an Order, Docket No. 56, which we caused the United States Marshal Service to personally serve upon Albert La Fontaine ("La Fontaine") -- the self-styled Judge of the "Tribal Court" -- directing that he personally appear before the Court on August 11, 2004, in order to show cause why he should not be held in Contempt of Court. Further, upon learning that Johnston had been served with the Notice of an ex parte contempt of Court before the "Tribal Court," we issued an Order on August 3, 2004, which notified the parties that, "[a]ny effort to impede the administration of justice, inclusive of efforts to seek the imposition of a Contempt of Court outside the jurisdiction of this Court, w[ould] result in the issuance of sanctions commensurate with that effort." Docket No. 59.

No appearance was made by La Fontaine at the Hearing on the Order to Show Cause. Instead, the Plaintiff filed two documents with the Clerk of Court. First, in what the Plaintiff styled as a "Notice of Non-Acceptance and Non-Agreement," the Plaintiff disputed the legitimacy of our Orders for reasons that were patently frivolous. See, Docket No. 77. The other filing purports to be a "Notice and Demand to Show Cause," that is dated August 5, 2004, and that was issued by La Fontaine, but was

mailed to the Clerk of Court by the Plaintiff -- as have been many of the documents bearing La Fontaine's signature.  In a Report and Recommendation dated August 20, 2004, we found no legitimacy to La Fontaine's "Court," and particularly insofar as La Fontaine had attempted to preempt the authority of this Court.  We found his acts to be <u>ultra vires</u>, and to fairly exhibit that "he is profoundly naive, is strikingly uninformed, or is seriously deluded, about the authority of the Federal Courts."  See, <u>Docket No. 87</u>.

Rather than sanction La Fontaine, we recommended that the District Court, the Honorable Richard H. Kyle presiding, issue an injunction, pursuant to the All Writs Act, <u>Title 28 U.S.C. §1651(a)</u>, that would "prohibit[] La Fontaine both individually, and in his purported role as a 'Judge,' from issuing any Order, or undertaking any other act, apart from contesting th[e] Report and Recommendation, which directly, or indirectly, impact[ed] upon any of the parties to this litigation, or the litigation itself." <u>Id.</u>, citing <u>Phillips Beverage Co. v. Belvedere, S.A.</u>, 204 F.3d 805, 806 (8th Cir. 2000). We went on to caution that our recommendation, against a Contempt finding, "should not be construed as temerity, or impotence, for, upon further provocation, we will not hesitate to respond."  <u>Id.</u> at 9.  In particular, we forewarned La Fontaine that continued attacks on the integrity of this Court could result in the imposition of civil Contempt,

or the matter could be referred to the United States Attorney for such criminal prosecutions as might be authorized by the United States Criminal Code. Id., citing Title 18 U.S.C. §1509. No objection was filed to our Report and Recommendation.

Following the issuance of our Report and Recommendation, and the filing of a Motion, by certain of the Defendants, to Quash the Tribal Court proceedings, the Plaintiff filed a Notice of Voluntary Dismissal on August 26, 2004. In support of the Voluntary Dismissal, the Plaintiff alleged that: "1) The United States District Court District of Minnesota lacks Jurisdiction; 2) Plaintiff Luther was NOT allowed to sign the Summons; and 3) The matter has been adjudicated." See, Docket No. 88. Certain of the Defendants promptly opposed the dismissal of the case and, since those Defendants had filed an Answer to the Plaintiff's original Complaint, the Plaintiff's attempt to self-execute a dismissal was precluded, absent a Court Order. See, Rule 41(a)(1), Federal Rules of Civil Procedure. As a result, by Order dated August 31, 2004, we held that "the Plaintiff's Notice of Voluntary Dismissal is inoperative until it has been validated by an Order of the Court, 'upon such terms and conditions as the court deems proper.'" Docket No. 93, at p. 3, quoting Rule 41(a)(2), Federal Rules of Civil Procedure. We set the issue as one to be addressed at the Motions Hearing scheduled for September 17, 2004.

- 29 -

On September 17, 2004, we conducted the Hearing on the parties' Motions. While the Plaintiff appeared at the Hearing, he made plain at the outset, that he regarded his case as having been dismissed, and he provided the Court with two Treaties which, he asserted, established the jurisdiction of La Fontaine's "Court." Tr. at pp. 6-11.  Neither document provides so much as an intimation that La Fontaine's Court has any lawful authority over litigants in this Court, much less over nonmembers of the Pembina Nation.  See, Docket No. 112, Exhibits 1 and 2.  Although we encouraged the Plaintiff to remain, and voiced our concern that, in his absence, the Court would not have the benefit of his position, the Plaintiff left the Hearing, and did not return. Tr. at pp. 7-11.

At that Hearing, counsel for Johnston drew our attention to a most unseemly incident when, on authority of one of La Fontaine's "Orders," local law enforcement officers were summoned by the Plaintiff, to the location of a deposition of the Plaintiff, which had been scheduled as a part of the underlying State Court proceeding, so as to incarcerate Johnston for allegedly being in contempt of La Fontaine's "Court." According to the Plaintiff, La Fontaine had issued an "Order," which the Plaintiff characterized as a "federal court order" that was issued by a "federal judge," and which required Johnston to be deposed prior to the Plaintiff's deposition -- a

- 30 -

deposition that, it appears, was scheduled to be taken at the direction of the State District Court.  Fortunately, the officers appear to have had the good common sense to recognize the implausibility of arresting Johnston, and Johnston was not arrested. See, Docket No. 131.

We were also informed that, following his failure to appear at the Hearing on our Order to Show Cause, La Fontaine issued a number of Orders which deliberately, and without any showing of lawful authority, have victimized certain of the Defendants in this action.   On August 20, 2004, La Fontaine issued an "Order and Judgment" adjudging each of the Defendants, except Georgia Nelson, in contempt of La Fontaine's "Court," and declaring "null and void" certain monetary instruments which obligated payments by the Plaintiff to American National.  La Fontaine's "Order and Judgment" provided as follows:

FINDINGS OF FACT

TAKE NOTICE, that this court finds the following:

1.      Plaintiff Luther did deliver to defendant American National Bank of Minnesota a Monetary Instrument valued at $247,000 and $111,000 dated Sept 30, 2002.

2.      Plaintiff Luther did deliver to defendant American National Bank of Minnesota a Monetary Instrument valued at $12,302.00 dated Feb 4, 2003.

3.     Plaintiff Luther did request the return of said instruments and defendant American National Bank of Minnesota has failed to return said instruments to Plaintiff Luther.

4.     Defendant American National Bank of Minnesota has failed to act in Good Faith and Fair dealings.

5.     Defendant American National Bank of Minnesota failed to give Plaintiff Luther consideration or proof of same.

6.     Defendant American National Bank of Minnesota in concert with defendant Scott Johnston did conduct an Unlawful Sheriffs [sic] sale of plaintiff's real estate and said sale is deemed to have NO force or effect pursuant to the following order.

7.     ALL defendants with the exception of Georgia Nelson are in contempt of court due to their violation of the Temporary Injunction and Restraining Order dated July, [sic] 22, 2004 issued by this court.

IT IS SO ORDERED AND ADJUDGED that the monetary instruments dated Sept, [sic] 30, 2002 and February 4, 2003 in the amount herein stated are hereby deemed NULL and VOID and deemed to have NO Force or Effect for failure of Defendant American National Bank to return said instruments to Plaintiff Luther, and upon Plaintiff's request and demand.

IT IS FURTHER ORDERED AND ADJUDGED that the documents labeled Mortgage Doc No. 230007 dated October 2, 2000, Mortgage Doc No 230009 dated Oct 2, 2002, Collateral Assignment Doc No 230012, Dated Oct 2,

2002, Collateral Assignment Doc No. 230013, Dated Oct 2, 2002, Financing Statement Doc No. 230010, Dated Oct 2, 2002, Assignment of Rents Doc No. 230008 Dated Oct 2, 2002, Assignment of Rents Doc No. 230010 Dated Oct 2, 2002 and Financing Statement dated February 5, 2003, Document No. 20036445933 are determined NULL and VOID and deemed to have NO Force or Effect for the failure of providing consideration or proof thereof.

Docket No. 98, at pp. 6-7 of 7.

Not satisfied to have forgiven, by every appearance, the Plaintiff's debt in the amount of $370,000.00, La Fontaine issued a second "ORDER" on August 20, 2004, which effected that absolution by providing as follows:

ORDER

IT IS SO ORDERED that Darlene Chermak, Douglas County Recorder, Alexandria Minnesota is hereby ordered and compelled to RECORD upon the real estate know [sic] as:

All of Lot 4 of ARVIDSON'S SUBDIVISION OF LOTS 34 AND 35 OF HIDDEN VALLEY, Douglas County, Minnesota, according to the recorded plat on file and record in the office of the County Recorder Douglas County, Minnesota;

AND

Lots 2, 3, 4, 5, 6, and 8, Block 1, WHITE OAK ESTATES, Douglas County, Minnesota, according to the recorded plat on file and record in the office of the County Recorder Douglas County, Minnesota,

- 33 -

> The Order and Judgment dated 8/20, 2004 issued by this
> court.

Id. at p. 4 of 7.

Notably, this Order also bears the legend of this Court.  Id. at p. 3 of 7.

The uncontroverted Record before this Court establishes that La Fontaine's declaration of August 20, 2004, that certain mortgages, and other documents of the Plaintiff's debt were "null and void," was accepted for recording in the Office of the Douglas County Recorder on August 24, 2004, as Document No. 260850.  See, Affidavit of Scott Johnston, Docket No. 98, at p. 2.  On the Record submitted, and without substantive challenge by the Plaintiff,[7] La Fontaine's "Orders" of August 20, 2004, are an act of fiat, have no legitimacy, and constitute a calculated, concerted attempt, by La Fontaine and the Plaintiff, to unlawfully cloud the title of the property that, it appears, is the subject of the State Court foreclosure proceedings.

Still not satisfied with merely eradicating the Plaintiff's indebtedness to American National, La Fontaine issued an "Order" on August 30, 2004, which provided as follows:

---

[7]Apparently of the view that "saying it is so, makes it so," the Plaintiff has filed various documents which simply state that this action is "Non Suited."  See, Docket Nos. 125, 128 and 129.  None of those documents disputes the issuance of La Fontaine's "Orders," nor offers the slightest legitimacy to their issuance.

ORDER AND JUDGMENT

FINDINGS OF FACT

TAKE NOTICE, that this court finds the following:

1.      Plaintiff Luther did deliver to defendant American National Bank of Minnesota Money valued at $247,000 and $111,000 dated Sept 30, 2002.

2.      Plaintiff Luther did deliver to defendant American National Bank of Minnesota Money valued at $12,302.00 dated Feb 4, 2003.

3.      Plaintiff Luther did BILL and request the return of said instruments and defendant American National Bank of Minnesota has failed to return said money failed to pay or make other arrangements to Plaintiff Luther.

4.      Defendant American National Bank of Minnesota has failed to act in Good Faith and Fair dealings.

5.      Defendant American National Bank of Minnesota has been found in violation of Title 62 of the United States revised Statutes.

6.      Defendant American National Bank of Minnesota is in Contempt of Court for violating a Subpoena to produce documentary evidence issued by this court.

7.      ALL defendants have engaged in attempted civil theft of Plaintiffs [sic] and the Pembina Nation's property.

IT IS SO ORDERED AND ADJUDGED that the money dated Sept 30, 2002 and February 4, 2003 in the amounts

> herein stated have NOT been returned to Plaintiff Luther
> this court awards Judgment in the Sum Certain amount of
> $247,000 and $111,000 dated Sept 30, 2002, and
> $12,302.00 dated Feb 4, 2003 and for Court Costs $750.00
> against in whole or in part ALL Defendants.

Docket No. 127-2, at pp. 8-9 of 9.

Plaintiff presented a UCC Financing Statement to the Douglas County Recorder's

office in an attempt to place a Judgment, in an amount in excess of $370,000.00,

"against the commercial real estate of the American National Bank in Alexandria and

also against [Johnston's] home and [his] lake cabin." Id. at p. 1 of 9.[8]

Similarly, the Plaintiff has employed the contrived "Orders" of La Fontaine to

submit Notices and Demands for Payment to random insurance companies, listing the

names of the Defendants, and directing as follows:

> PLEASE TAKE NOTICE that Bruce Luther has a monetary
> Judgment for a liability against the following persons.
> Pursuant to said Judgment in the event any person from
> said list is insured by your company by way of a Liability
> Policy not limited to a [sic] Auto LIABILITY Insurance
> Policy, please consider this a NOTICE and DEMAND for
> payment in the sum certain amount of $358,050.00 for each
> of said persons.

---

[8]At the time of our Report and Recommendation of October 26, 2004, certain of the Plaintiff's acts were not supported by sworn testimony, an oversight which has now been cured. See, Affidavit of Richard L. Pemberton, Sr., [Docket No. 136-1], at p. 3 of 4.

<u>Docket No. 126-2</u>, at p. 1 of 1.

As averred by counsel for Johnston, the Plaintiff has approached his insurance carrier to turn over counsel's insurance policies.

Lastly, we have recently been advised, by correspondence from Johnston's counsel, that the Plaintiff filed, on October 4, 2004, in the Minnesota District Court for the Seventh Judicial District, a Notice of Entry of Judgment and Injunction. We find the Notice of Entry of Judgment, and Injunction, to be self-authenticating, and to provide as follows:

ORDER FOR PERMANENT INJUNCTION

> TAKE NOTICE, a Permanent Injunction is so ordered that ALL Defendants their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with, to proceed NO FURTHER with any action related to Plaintiff Bruce Luther.

> IT IS SO ORDERED

<u>Docket No. 130-2</u>, at p. 3 of 8.

La Fontaine's "Permanent Injunction" is dated August 30, 2004, no more than four (4) days after La Fontaine was personally served with our Report and Recommendation,

see Docket No. 91,[9] "[t]hat the District Court issue an Injunction, pursuant to the All Writs Act, that prohibits Albert La Fontaine, both individually and in his purported role as a 'Judge,' from issuing any Order, or undertaking any other act, apart from contesting this Report and Recommendation, which directly or indirectly, impacts upon any of the parties to this litigation, or upon the litigation itself." Docket No. 87, at p. 10. Notably each of the "Defendants," who La Fontaine seeks to enjoin, are either Defendants in this action, or are counsel for a Defendant and, if honored, the "Injunction" would enjoin the continued processing of this action.[10]

---

[9]We also underscore that La Fontaine's "Permanent Injunction," and the Plaintiff's effort to enforce it, as well as La Fontaine's other "Orders" against the Defendants, are directly contrary to our directive, in our Order of August 3, 2004, which states as follows:

> [U]ntil further Order of this Court, the jurisdiction over this action remains in this Federal Court. Any effort to impede the administration of justice, inclusive of efforts to seek the imposition of a Contempt of Court outside of this jurisdiction of this Court, will result in the issuance of sanctions commensurate with that effort.

Docket No. 59, at p. 2.

Plainly, the Plaintiff has violated that admonition, and is subject to commensurate sanctions.

[10]While not, at any time, having been called to our attention by the Plaintiff, there was a suggestion that the Plaintiff had filed a Petition for bankruptcy protection. See,

(continued...)

- 38 -

Given this dogged, and malicious course of conduct, there can be no doubt that

the Plaintiff's conduct is an abuse of the judicial process.   While one could argue that

the greater offender was La Fontaine, he is not a party to this action, and his conduct

would have been innocuous but for the content of his "Orders" which could only find

the Plaintiff as their source.   One could also argue that, if a judicial process was

abused, it was attendant to the "Tribal Court," but such an argument would ignore the

fact that many of the "Tribal Court's Orders" bear the legend of this Court, as the

Plaintiff purported to have removed this case, together with its Defendants, to a

---

[10](...continued)
Affidavit of Richard L. Pemberton, Docket No. 97, at p. 4.  In order to assure that our
Report and Recommendation of October 26, 2004, would not run afoul of any
bankruptcy stay, we have reviewed Bankruptcy Petition No. 04-60753, which was filed
by the Plaintiff in the United States Bankruptcy Court in this District, on June 24, 2004.
Neither this litigation, nor the State Court foreclosure action, are disclosed in the
Voluntary Petition for Bankruptcy that he filed.  By letter dated August 26, 2004, the
Plaintiff advised the Bankruptcy Court that his "signature has been WITHDRAWN
from case 04-60753."  Bankruptcy Docket No. 15.  By an undated letter, which was
docketed by the Bankruptcy Clerk on September 23, 2004, see Bankruptcy Docket
No. 16, the Plaintiff removed his attorney from that case, and reminded the Clerk that
his signature had been "withdrawn."  Id.  By Motion dated August 12, 2004, see
Bankruptcy Docket No. 13, the Bankruptcy Trustee sought the dismissal of the
Plaintiff's Petition as the Plaintiff "has no valid bankruptcy petition or schedules," and
does not qualify for relief under bankruptcy law."  Id.  By Order dated September 28,
2004, the United States Bankruptcy Court, the Honorable Dennis D. O'Brien
presiding, dismissed the Plaintiff's Bankruptcy Petition.  See, Bankruptcy Docket No.
17.

"Court" in which they did not belong.  Quite plainly, the Defendants found themselves entangled in a nightmare of torment based upon the Plaintiff's attempt to usurp the authority of this Court, and invest that authority in the rump-Court of La Fontaine. While we attempted, on several occasions, to deter the Plaintiff's conduct, by forewarning him of the potential for sanctions, his aim on maliciousness was not to be deterred or abated.  To characterize the Plaintiff's conduct as unscrupulous is an understatement -- he has engaged in a continuing scheme to defraud the Defendants, to perpetrate fraud on this Court, as well as unquestionably contumacious conduct. His effort to economically harm anyone with whom he disagreed -- Defendants and defense counsel alike -- was as unprincipled as it was dishonest and unlawful. Fortunately, to our knowledge, it is also unprecedented.

Essentially, the Plaintiff abandoned his Complaint in this action, on August 26, 2004, when he sought to "WITHDRAW my signature and DISMISS the matter."  By that time, the Plaintiff was in receipt of our Report and Recommendation of August 20, 2004, recommending that the District Court enjoin La Fontaine's Court from directly, or indirectly, impacting upon any of the parties to this litigation.  The Plaintiff's conduct was not to be constrained, however, and his vexatious path of harassment continued in earnest, and without relent.  There can be no legitimate claim

that the Plaintiff's acts were inadvertent, or had some remote legal basis -- they were intentionally designed to inflict as much personal embarrassment, annoyance, and economic loss, as he could devise.   The Plaintiff has never claimed innocence, inadvertence, or mistake, and we find no responsible basis for any such claim were it made.     Indeed, the Plaintiff interposed no objections to our Report and Recommendation of October 26, 2004, which also detailed his ignoble acts.

As a consequence, we recommend that, in exercising the Court's inherent authority to manage its cases, and docket, the Plaintiff's Complaint be dismissed, with prejudice, as to Johnston, Robert Allen, and Arden Anderson, as the Plaintiff's campaign of harassment cannot go unpunished in a system of justice.   While we are mindful that an argument could be advanced that, since the District Court's injunction, no further harassing acts, by the Plaintiff or La Fontaine, have been drawn to our attention, that does not address the enormity of the Plaintiff's past abusive acts, which warrant severe sanction.   We have considered less drastic sanctions, but conclude that, even with a dismissal of his claim, the Plaintiff is not adequately punished.   As noted, his interest in this case waned last year, and he would have been content if his Voluntary Dismissal had been granted without conditions.   When faced with the reality of his acts of bad faith, which would have caused him to pay substantial attorneys'

fees, the Plaintiff elected not to proceed with a Voluntary Dismissal.  Were he only to be sanctioned by the loss of a case -- as to certain of the Defendants -- the Plaintiff would not feel the full brunt of his wrongful conduct.   As a result, we find the circumstances presented here, different from those the Court considered in Pope v. Federal Express Corp., 974 F.2d 982, 985 (8th Cir. 1992), where the Court intimated that a dismissal with prejudice might be a sufficient sanction, but left that determination to the Trial Court.  Accordingly, we recommend that the Plaintiff also be required to pay a portion of the Defendants' attorneys fees, in conjunction with the dismissals.

In that respect, we have closely reviewed the billing statements that counsel for the Defendants submitted in conjunction with their objections to our Report and Recommendation of October 26, 2004.  Their recitation of hours worked, as well as for their hourly fees, are reasonable for the work involved, and for the region of the District in which the work was performed.  The reality, however, is that a lawyer's participation in a case involving a party who represents him- or herself has a potential to incur hours of labor that are not presented when all parties are represented by counsel.  Further, some of the work that is detailed in the billing sheets is the type of legal effort that would have been generated even if the Plaintiff had been represented by counsel, and is routine to the pretrial processing of the case.

- 42 -

Accordingly, while the total of defense counsel's fee request is in the approximate amount of $20,000.00, we find that only $10,000.00 should be awarded against the Plaintiff as attorneys' fees. We recognize that this amount is substantially less than the District Court determined, upon accepting our Report and Recommendation, but the predicate for the larger award was that the Plaintiff had recognized, by his request for a Voluntary Dismissal, that his causes of action were without merit, thereby rendering all of the defenses fees unnecessary. Here, we make no assessment of the merits of the Plaintiff's case -- although, facially, it is difficult to discern a claim upon which relief could be granted -- and, by our current Recommendation, the Plaintiff will be denied the right to pursue those claims against those Defendants who are dismissed with prejudice. We find that to be a sufficient distinction to warrant a reduction in any fee award.

In any event, the imposition of a fee award under the Court's inherent power is not to make the Defendants whole, but to appropriately punish the wrongdoer, and to deter others of like mind.[11]  Without a fee award as an additional punishment, we can

---

[11]For the same reason, we do not recommend that an award be made for the costs incurred by the Defendants, as those costs, insofar as we can tell, would have been largely incurred even in the absence of the misconduct of the Plaintiff which we have

(continued...)

readily foresee the Plaintiff renewing his claims against the Defendants who were

dismissed without prejudice, or in devising a means to subject the other Defendants

to further harassment.  As a result of these sanctions, the Plaintiff should learn that the

Court processes are reserved for legitimate factual and legal disputes, and should not

be adulterated into a vehicle for baseless, hurtful, and damaging personal attacks.  We

further conclude that others, who would adopt the Plaintiff's course of wanton

conduct, so as to dissuade the pursuit of foreclosure proceedings, will appreciate the

futility, and ultimate expense of the Plaintiff's ways, and conduct themselves

appropriately, and according to law.   In turn, the sanctions we recommend should

assure the Defendants that the Court processes will not employed, indirectly and

deviously, to wage baseless attacks, without the consequent imposition of

commensurate punishment.[12]

NOW, THEREFORE, It is --

ORDERED:

---

[11](...continued)
detailed.

[12]Given the Recommendation we make, the remaining Motions of the parties should
be denied as moot.

1.     That the Plaintiff's Motion to Stay Foreclosure Proceedings [Docket No. 4] be denied as moot.

2.     That the Defendant Scott T. Johnston's Motion to Dismiss [Docket No. 10] be denied.

3.     That the Motions of the Defendants Thomas Johnson, Scott Allen, Patrick Smith, American National Bank of Minnesota, Lloyd Arbart, Thomas Kotula, and Marvin Shipman, to Dismiss [Docket No. 19] be granted, but without prejudice.

4.     That the Motions of the Defendants Robert Allen, and Arden Anderson, to Dismiss [Docket No. 19] be denied.

5.     That the Motions of the Defendants Peter Irvine, and Rhonda Russell, to Dismiss [Docket No. 30] be granted.

6.     That the Motions of the Defendant Scott T. Johnston to Quash Subpoena Served on Sprint Communications by Plaintiff [Docket No. 60] be denied as moot.

7.     That the Motion of the Defendant Scott T. Johnston for Sanctions [Docket No. 94] be granted.

8.     That the Motions of the Defendants Thomas Johnson, Scott Allen, Patrick Smith, Robert Allen, American National Bank of Minnesota, Arlen Anderson,

Lloyd Arbart, Thomas Kotula, and Marvin Shipman, for Sanctions [Docket No. 108]

be granted.

9.     That the Plaintiff's Motion to Quash All Motions of All Defendants and

Sanctions for Misusing the Court System [Docket No. 112] be denied as moot.


Dated:  August 4, 2005            s/Raymond L. Erickson
                                  Raymond L. Erickson
                                  UNITED STATES MAGISTRATE JUDGE


**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.2(b), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties **by no later than August**

**19, 2005**, a writing which specifically identifies those portions of the Report to which

objections are made and the bases of those objections.  Failure to comply with this

procedure shall operate as a forfeiture of the objecting party's right to seek review in

the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

- 46 -

transcript of that Hearing **by no later than August 19, 2005**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to

review the transcript in order to resolve all of the objections made.